

Signed and Filed: October 19, 2018

_____
**DENNIS MONTALI
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

```
In re                              ) Bankruptcy Case
                                   ) No. 11-12728-DM
RICK RIVERA IBE and                )
GENE ROSE MORENO IBE,              ) Chapter 13
                                   )
            Debtors.               )
_____)
```

MEMORANDUM DECISION ON MOTION FOR CONTEMPT
------------------------------------------

Following their discharges in 2016, debtors Rick Rivera Ibe and Gene Rose Moreno Ibe ("Debtors") received various communications from Select Portfolio Servicing, Inc. (the "Servicer") regarding a loan secured by property commonly identified as 202-A Allen Richard Court, Moncks Corner, South Carolina (the "202-A Unit"). After the court granted the motion to reopen their case on April 18, 2018, Debtors filed a Motion for Contempt (the "Contempt Motion"). Their initial filing was for an Order to Show Cause, but the court directed that it be renamed, consistent with Rule 9020.[1]

In the Contempt Motion, Debtors alleged that certain of these communications sent by Servicer to them violated their discharge injunction provided by section 524(a). In response, Servicer

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

argued that the debt secured by the 202-A Unit was not discharged because Debtors did not schedule it or provide treatment for it under their plan. Even though the court does not find that position persuasive, it does agree with Servicer's argument that some of the communications do not constitute violations of the discharge injunction. Therefore, for the reasons stated below, the court will grant in part and deny in part the Contempt Motion.

I.  FACTUAL BACKGROUND[2]

Debtors owned two condominiums in Moncks Corner, South Carolina: the 202-A Unit and a second one located at 202-B Allen Richard Court (the "202-B Unit"). Their Schedule F reflected the two different units with loans from two different lenders, although their Schedule D identified only the 202-B Unit as the collateral on the loans. Debtors' response to Question 4 of their Statement of Financial Affairs reflected two different foreclosure proceedings then pending in Berkeley County, South Carolina.[3]

In their amended chapter 13 plan filed on November 8, 2011, Debtors indicated three times in Part IV(B) that they were surrendering Unit 202-B, identifying BAC Home Loans Servicing, GMAC Mortgage, and The Cedar Grove HOA as the secured creditors.

---

[2] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

[3] In its supplemental briefing filed on August 22, 2018, Servicer observed that the loan identified in the schedules as being secured by the 202-A Unit was a different loan than the one it was servicing. In support of this contention, it notes that the listed debt was at a much lower amount and was identified by a different loan number. Nonetheless, Servicer did have notice of the bankruptcy and of the Debtor's plan, which did not indicate any intent to retain the 202-A Unit or to make payments on any loan secured by the 202-A Unit.

-2-

The court confirmed that plan on January 27, 2012.

On December 17, 2012, HSBC Bank, acting by and through Servicer, filed a motion for relief from stay as to the 202-B Unit; the court granted relief from stay by an order entered on January 11, 2013. On August 21, 2015, Servicer (again acting on behalf of HSBC) filed a motion for relief from the automatic stay as to the 202-A Unit; the court granted relief from the stay by an order entered on September 11, 2015.

Following completion of their confirmed chapter 13 plan, Debtors received their discharges on October 14, 2016. In two different adversary proceedings filed thereafter, Debtors alleged that Servicer continued to send demand letters to collect discharged debts in violation of the discharge injunction (*see* A.P. 16-1112, Dkt. 1, ¶ 21, and A.P. No. 17-1020, Dkt. 1, ¶ 20). Both actions were dismissed following settlements in the amount of $3,000 and $4,000, respectively, paid by Servicer to Debtors.

In the Contempt Motion, Debtors allege that Servicer continues to violate the discharge injunction despite its knowledge of it. Servicer received notice of the discharges by mail to an address in Salt Lake City, Utah. *See* Dkt. 48, p.1. Attorney Christelle Nicole Ramsayer, who represented HSBC appearing by and through Servicer in the 2015 motion for relief from stay, still receives electronic notices in this case and was provided notice of Debtors' discharges. *Id.* at p.2.

Notwithstanding the discharges and the prior actions against it for violating the discharge injunction, Servicer in 2017 and 2018 sent several written communications to Debtors described in more detail below. Many of these communications acknowledged that

-3-

Case: 11-12728    Doc# 81    Filed: 10/19/18    Entered: 10/19/18 14:39:40    Page 3 of 11

the debt secured by Unit 202-A "has either been discharged or is subject to the automatic stay." Debtors assert that these communications violated the discharge injunction.[4]

## II. THE COMMUNICATIONS[5]

### A. Monthly Statements, Notices of Interest Rate Changes And Other Loan Notifications

On December 15, 2016, Servicer sent a mortgage statement to Debtors containing a "**Delinquency Notice**" indicating that they "must pay" $52,722.54 to bring the loan current. *See* Dkt. 68-1 at pg. 34. It further stated that "[d]ue to the delinquent status of your loan a property inspection and/or valuation report was ordered and you are responsible to reimburse us for the amounts plus interest, which may be billed at the note rate." *Id.* at p. 36. A subsequent mortgage statement dated January 13, 2017, contained the same language. *Id.* at pp. 38-40.

The December 2016 and January 2017 monthly mortgage statements were the only two mortgage statements containing the

---

[4] Section 524(a) contains the discharge injunction. It provides in relevant part that the discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or <u>an act, to collect, recover or offset any such debt as a personal liability of the debtor</u>, whether or not discharge of such debt is waived." 11 U.S.C. §524(a)(2)(emphasis added).

[5] The Contempt Motion identifies thirty communications Debtors contend were contemptuous. However, the first thirteen were sent before settlement of A.P. 17-1020. The settlement contained a broad general release that necessarily included pre-settlement communications. The thirtieth, a letter dated April 2, 2018, regarding cancellation of insurance, was not sent by Servicer. Thus only sixteen communications, between September 15, 2017, and April 2, 2018, could possibly be actionable now. That said, for context and to describe some of Servicer's non-contemptuous conduct, the court will discuss some communications that predate the second settlement.

-4-

**Delinquency Notice**\*\* language following the November 2016 discharge; all subsequent notices acknowledged the bankruptcy and indicated that the statements were not an attempt to collect a debt and were being sent for informational purposes only. *See, e.g.,* Dkt. 68-2 at pp. 8 and 14; Dkt. 61-3 at pp. 2-10. That said, even though it "acknowledge[d] your bankruptcy filing," Servicer nonetheless stated that any payments made on the account should be sent to an address listed on an attached coupon. *See, e.g.,* Dkt. 61-3 at p. 3, 6, 9; 64-1 at p. 13; 64-6 at p. 13.

On June 6 and December 6, 2017, Servicer sent letters indicating that the interest on the loan was scheduled to increase and that Debtors' monthly payment would increase accordingly. Dkt. 68-2 at p. 11; Dkt. 61-3 at p. 14. Both of these letters indicated that they were sent for informational purposes only and were not "considered an attempt to collect a debt."

On February 1, 2018, Servicer notified Debtors "pursuant to applicable law" that their escrow account had a deficient balance of $29,510.55. This letter also contained the disclaimer that "[t]his information is intended for informational purposes only and is not considered an attempt to collect a debt." *See* Dkt. 61-4 at p. 11.

**B. Notices Regarding Foreclosure and Foreclosure Alternatives**

On several occasions, Servicer sent letters to Debtors noting that they were in default and discussing possible alternatives to foreclosure. One letter stated:

> Our records indicate that your obligation has either been discharged or is subject to an automatic stay order under the United States Bankruptcy Code. This notice and the enclosed documents are for compliance and

-5-

informational purposes only and do not constitute a
demand for payment or an attempt to collect such
obligation. Even though your personal liability on the
note may be discharged or subject to an automatic stay,
the terms of the mortgage remain in effect and the owner
of the mortgage, as lien holder, continues to have a
lien on the real property.

*See, e.g.,* Dkt. 61-2 at p. 16.

Servicer also sent notices regarding the scheduling and re-scheduling of foreclosure sales. These notices contained the following language:

Please note that SPS is sending this to you to provide
information regarding the lien on the real property
referenced above. Our records indicate that your
obligation has been discharged under the United States
Bankruptcy Code. This notice and any enclosed documents
are for compliance and informational purposes only and
do not constitute a demand for payment or an attempt to
collect such obligation. Even though your personal
liability on the note may be discharged, the terms of
the mortgage remain in effect and the owner of the
mortgage, as lien holder, continues to have a lien on
the real property.

*See, e.g.,* Dkt. 61-3 at p. 12; Dkt. 61-4 at p. 3-4.

One of these scheduling notices, however, contained language seeming to impose additional duties on Debtors with respect to their discharged debt: "Please notify us by calling the toll-free number below or by sending written verification informing us that you have secured, winterized, and/or maintained the property to Select Portfolio Servicing, Inc., PO Box 65250 Salt Lake City, UT 84165-0250." Dkt. 61-4 at p. 4.

**C. Point of Contact Notices**

On two occasions, Servicer notified Debtors of a single point of contact or "Relationship Manager" to assist them with "any aspect of your mortgage." *See* Dkt. 61-4, pp. 1 and 6. These letters also note that "[t]his information is intended for

-6-

informational purposes only and is not considered an attempt to collect a debt."

**D. Notices Regarding Insurance and Property Maintenance**

On December 18, 2017, Servicer notified Debtors that it had purchased insurance for the property that would cost an estimated $1,226.00 annually. *See* Dkt. 61-3 at p. 21. Servicer then noted Debtors would be responsible for the cost of the insurance obtained by it:

> If SPS has to purchase a policy/certificate on your behalf, you will be responsible for the cost of the policy/certificate beginning from the date the insurance is placed. Any limited coverage that applies after your policy expiration/cancellation date is not acceptable insurance to SPS. It is extremely important that we receive this information within fifteen (15) days from receipt of this letter. To ensure prompt service, please include your SPS loan number on all correspondence faxed or mailed to our office.

*See* Dkt. 61-3 at p. 22.

On February 19, 2018, Servicer sent a "Notice of Insurance Renewal" to Debtors informing them that their failure to keep insurance on Unit 202-A would result in the lender obtaining coverage for which they would be charged – even though Servicer had obtained relief from the stay to foreclose in 2015. *See* Dkt. 61-4 at pp. 16-17.

On March 12, 2018, Servicer sent a letter informing Debtors that they were responsible for property preservation such as securing, winterizing, and maintaining Unit 202-A. *See* Dkt. 61-6 at p. 11. "Failure to secure, winterize and/or maintain the property could result in an additional expense to you if [Servicer] performs such actions on your behalf." *Id.* Servicer demanded that Debtors respond within ten days of the letter.

"Failure to reply and/or failure to maintain the property will result in SPS taking the steps necessary to secure, winterize, and/or maintain the property. You will be responsible for paying the costs incurred by SPS for taking these steps on your behalf." *Id.*

III. <u>DISCUSSION</u>

In order to prevail on the Contempt Motion, Debtors have to establish by clear and convincing evidence that Servicer not only violated the discharge injunction but also knew that it applied and intended to violate it. *In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006); *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1215 (9th Cir. 2002). As discussed below, the history of prior adversary proceedings commenced by Debtors against Servicer (subsequently settled) reflect Servicer's knowledge of the discharge injunction. Additionally, many of the documents sent to Debtors by Servicer acknowledged the discharge injunction. Nonetheless, four of those documents clearly violated the discharge injunction.

Even though the Debtors' discharge did not eliminate a secured creditor's lien against the property, it did eliminate their personal liability on the secured debt. 11 U.S.C. § 524(a)(2). Thus, Servicer – as an agent for a secured creditor -- may still enforce the lien against Debtors' property after their discharge, but may not demand payment or other compliance from them. *See In re Marino*, 577 B.R. 772, 783-84 (9th Cir. BAP 2017). As the BAP acknowledged:

> This creates some tension. While the discharge generally prohibits creditors from communicating with discharged debtors in an effort to extract payment,

>     lienholders usually must communicate with debtors in
>     order to enforce their liens. For example, a
>     foreclosure of a mortgage without notice to the
>     mortgagor would likely be invalid even if the mortgagor
>     were not personally liable for the mortgage debt.

*Id.*

"When a secured creditor retains a lien on the debtor's property after the discharge, courts have held that it is not per se improper for the secured creditor to contact a debtor to send payment coupons, determine whether payments will be made on the secured debt, or inform the debtor of a possible foreclosure or repossession, as long as it is clear the creditor is not attempting to collect the debt as a personal liability." *In re Culpepper*, 481 B.R. 650, 658 (Bankr. D. Or. 2012) (citing 4 Collier on Bankruptcy ¶ 524.02[2][b]); *see also In re Gill*, 529 B.R. 31, 37 (Bankr. W.D.N.Y. 2015) ("The discharge injunction does not prohibit every communication between a creditor and debtor—only those designed to collect, recover or offset any such debt as a personal liability of the debtor.").[6]

In this case, the court finds and determines that the language in the monthly statements, notices of interest rate changes and other loan notifications, and the notices regarding points of contact do not violate the discharge injunction, as they provided information generally required by law. Most of these communications generally did not require action by Debtors, clearly notified Debtors that the "information was provided for informational purposes only," and were not efforts to collect a

---

[6] As the property securing the lien was not on Debtor's principal residence, the limits on the scope of the discharge injunction set forth in section 524(j) are inapplicable here.

debt.

With one exception, the notices regarding foreclosure sales and possible alternatives to foreclosure likewise did not violate the discharge injunction. That exception was the notice dated January 3, 2018, requesting Debtors to verify that they had "winterized, and/or maintained the property." Dkt. 61-4 at p. 4. This language imposes a obligation on Debtors that is beyond an in rem obligation, particularly when Servicer had obtained relief from the automatic stay in 2015.

Similarly, the three notices regarding insurance and property maintenance did not simply "provide information for informational purposes." They imposed obligations on Debtors to secure insurance and maintain the Property, even though Debtors had received their discharge. In other words, they demanded actions by the Debtors and sometimes threatened consequences if those actions were not taken. *See* letters dated December, 18, 2017 (Dkt. 61-3, pgs. 21-22, 25); and February 19, 2018, (Dkt. 61-4, p. 16-17) (informing Debtors that Servicer had obtained insurance on Unit 202-A and had added the cost to the mortgage; threatening Debtors that they would be responsible for the higher costs of placed insurance if they did not obtain their own hazard insurance policy on the property); letter dated March 12, 2018 (Dkt. No. 61-6, p. 11)(despite acknowledging Debtors' discharge, informing debtors that they would be responsible for the costs to secure, winterize, and maintain Unit 202-A).

The court finds that Servicer intended to send and did send the four letters demanding actions from debtors, despite its awareness of the discharge injunction and even though relief from

-10-

the stay had been granted to the lender more than two years prior to the communications.

IV. CONCLUSION

In light of the coercive and threatening language of the four communications, the court finds that Servicer willfully and knowingly violated the discharge injunction. This determination is reinforced by the two prior adversary proceedings that Debtors filed and Servicer paid to settle. It apparently still has not gotten the message. Maybe it will now. Debtors are entitled to damages in the amount of $3,000 for each violation of the discharge injunction, for a total award of $12,000. The remaining communications by Servicer to Debtors did not violate the discharge injunction, and thus the court denies sanctions as to those. Debtors have not established grounds for emotional distress damages or for punitive damages.

The court is this date issuing an order consistent with this award.

Debtors are also entitled to an award of reasonable attorneys fees for prosecuting this partially successful motion. It encourages counsel to meet and confer to attempt to determine an appropriate amount. If a consensus cannot be reached, counsel for Debtors should file and notice an appropriate motion in accordance with the Bankruptcy Local Rules.

*** END OF MEMORANDUM DECISION ***